IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

No. 15-1068

**FILED**
**March 7, 2017**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JOHNNIE RAY FARLEY,
Defendant Below, Petitioner

Appeal from the Circuit Court of Mercer County
Honorable Omar J. Aboulhosn, Judge
Criminal Action No. 15-F-37

AFFIRMED

Submitted:  February 8, 2017
Filed:  March 7, 2017

John Earl (Jay) Williams Jr., Esq.          Patrick Morrisey, Esq.
Raeann Osborne, Esq.                        Attorney General
Princeton, West Virginia                    David A. Stackpole, Esq.
Counsel for Petitioner                      Assistant Attorney General
                                            Charleston, West Virginia
                                            Counsel for Respondent

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.  "To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." Syl. Pt. 3, *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995).

2.  "A police officer may continue to question a suspect in a noncustodial setting, even though the suspect has made a request for counsel during the interrogation, so long as the officer's continued questioning does not render statements made by the suspect involuntary." Syl. Pt. 3, *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006), *overruled on other grounds by State v. Eilola*, 226 W.Va. 698, 704 S.E.2d 698 (2010).

3.  "A trial court's determination of whether a custodial interrogation environment exists for purposes of giving *Miranda* warnings to a suspect is based upon whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest." Syl. Pt. 1, *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006), *overruled on other grounds by State v. Eilola*, 226 W.Va. 698, 704 S.E.2d 698 (2010).

i

4.     "The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include:  the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of time between the questioning and formal arrest."  Syl. Pt. 2, *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006), *overruled on other grounds by State v. Eilola*, 226 W.Va. 698, 704 S.E.2d 698 (2010).

5.   "Where police have given *Miranda* warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins. Absent an effective waiver of these rights, interrogation must cease." Syl. Pt. 4, *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995).

6.   "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *State v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975).

7.   "Under the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule if it is shown that the evidence would have been discovered

pursuant to a properly executed search warrant." Syl. Pt. 3, *State v. Flippo*, 212 W.Va. 560, 575 S.E.2d 170 (2002).

8. "When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction." Syl. Pt. 2, *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995).

9. "'Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given.' Syl. pt. 4, *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971)." Syl. Pt. 14, *State v. Davis*, 232 W.Va. 398, 752 S.E.2d 429 (2013).

10.   "'The granting of a continuance is a matter within the sound discretion of the trial court, though subject to review, and the refusal thereof is not ground[s] for reversal unless it is made to appear that the court abused its discretion, and that its refusal has worked injury and prejudice to the rights of the party in whose behalf the motion was made.' Syllabus point 1, *State v. Jones*, 84 W.Va. 85, 99 S.E. 271 (1919)." Syl. Pt. 1, *State v. Dunn*, 237 W.Va. 155, 786 S.E.2d 174 (2016).

11. "'Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial.' Syllabus point 3, *State v. Ferguson*, 165 W.Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds by State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)." Syl. Pt. 7, *State v. McKinley*, 234 W.Va. 143, 764 S.E.2d 303 (2014).

12. "Although it virtually is impossible to outline all factors that should be considered by the trial court, the court should consider when a motion for bifurcation is made:  (a) whether limiting instructions to the jury would be effective; (b) whether a party desires to introduce evidence solely for sentencing purposes but not on the merits; (c) whether evidence would be admissible on sentencing but would not be admissible on the merits or vice versa; (d) whether either party can demonstrate unfair prejudice or disadvantage by bifurcation; (e) whether a unitary trial would cause the parties to forego

iv

introducing relevant evidence for sentencing purposes; and (f) whether bifurcation

unreasonably would lengthen the trial." Syl. Pt. 6, *State v. LaRock*, 196 W.Va. 294, 470

S.E.2d 613 (1996).

**LOUGHRY, Chief Justice:**

The petitioner, Johnnie Ray Farley, appeals the October 13, 2015,[1] order of the Circuit Court of Mercer County denying his motion for a new trial subsequent to his jury conviction for murder in the first degree. The jury did not recommend mercy. The petitioner alleges the circuit court committed reversible error by denying his motion to suppress his October 3, 2014, confession; by denying his motions pertaining to forensic samples collected by the medical examiner; by admitting evidence that he contends should have been excluded by West Virginia Rule of Evidence 404(b); and by denying his motion to bifurcate the trial into guilt and mercy phases. After a thorough review of the record on appeal, the parties' arguments, and the relevant law, we find no reversible error and affirm.

## I. Factual and Procedural Background

The petitioner confessed that on September 25, 2014, he drove his wife, Lynette Farley, to uninhabited, rural property he owns in Mercer County (referred to as his "farm"). In his vehicle, the petitioner brought a shovel, a mattock, and a concealed shotgun. Shortly after their arrival, the petitioner retrieved the shotgun and shot Mrs. Farley in the chest. After watching his wife die, the petitioner removed all of her clothing, dragged her body down a hillside, dug a shallow grave using his shovel and mattock, and then buried her.

---

[1]The written order was signed on October 9, 2015, and was filed with the circuit clerk on October 13, 2015.

1

The petitioner shoveled dirt containing the victim's blood into the woods, and threw the empty shell casing into some bushes. When he was finished cleaning up the crime scene, he left the farm and returned to his home in Raleigh County. The petitioner put the shovel and mattock in a storage area at his house, and he hid the shotgun inside a neighbor's burned-out building. He disposed of his wife's purse and bloody clothes by placing them in the trash. In an effort to divert attention away from himself, the petitioner used his wife's cellular telephone to send text messages purporting to be from Mrs. Farley to himself and to Mrs. Farley's daughter. Later, the petitioner threw her cellular telephone into a lake.

On September 29, 2014, the petitioner went to the Beckley Detachment of the West Virginia State Police (sometimes referred to herein as the "police station") to report that his wife was a missing person. At the request of the troopers who were investigating his missing person report, the petitioner returned to the detachment on September 30 and October 2, 2014, to give audio-recorded statements. The petitioner denied any knowledge of his wife's whereabouts and denied harming her. He admitted that his wife had left him several times since January and, during one of those times, she had moved in with another man, Alexander Penn, for thirty days. He told police that he was worried because his wife had not contacted him during her current absence. The petitioner said the last time he saw his wife was on September 25th, when he drove her to the drive-through window of a

2

McDonald's restaurant in Beckley and then took her back to their home. The petitioner claimed that after leaving his wife at home, he drove to his farm alone.

The troopers' subsequent investigation into the missing person report revealed some inconsistencies between the petitioner's story and the evidence. The petitioner said that he and his wife left McDonald's and returned home, but the restaurant's video surveillance footage showed the petitioner's truck heading away from their home and toward the farm. Police also obtained records from the victim's cellular telephone company showing that her telephone had "pinged" a tower in the area of the farm on September 25th. Finally, credit card information and other video surveillance footage showed that the petitioner used the victim's credit card to purchase gasoline on his way home from the farm on September 25th.

During the proceedings below, Trooper S.G. Milam and Sergeant Robert Richards testified that on October 3, 2014, they went to the petitioner's home to inquire whether he would provide a third statement to follow-up on his missing person report. The petitioner agreed and accepted the offer of a ride to the police station in order to save money on gasoline. The petitioner was not arrested or handcuffed. At the beginning of this audio-recorded interview, which began at 11:54 a.m., Trooper Milam and Sergeant Richards reviewed an "Interview & Miranda Rights Form" with the petitioner. They advised the petitioner that he was free to leave at any time and was not under arrest:

**Tpr Milam:** Alrighty. This one [referencing a provision in the the waiver form] doesn't apply to you. You are not under arrest of a crime. So we're going to mark it out. You are being questioned in regard of Miss Lynnette Farley, your wife.

**Petitioner:** Yeah.

**Sgt Richards:** The disappearance of Lynnette Farley.

**Tpr Milam:** Okay. If you understand that and you agree with it, I'd ask that you initial right there. This line that I put through "you're not under arrest," I'm going to put my initials beside it because that's my line through there.

**Petitioner:** Okay.

**Tpr Milam:** But here, you are not under arrest and are free to leave at any time. Do you understand that?

**Petitioner:** Yeah.

**Tpr Milam:** If you do I'd ask that you initial. . . .

The petitioner initialed the portion of the form indicating that he was not under arrest. Next,

Trooper Milam went over the portion of the waiver form advising the petitioner of his

*Miranda* rights:

**Tpr Milam:** You have the right to talk to a lawyer for advice before we speak or before we ask you any questions and to have him or her with you during questioning; do you understand that?

**Petitioner:** Yeah. But I can't afford one. If I could I'd already had one.

**Sgt Richards:** Today is Friday, ain't it?

**Tpr Milam:** If you are–if you are under arrest and cannot afford a lawyer the court will appoint one for you before questioning at your request; do you understand that?

**Petitioner:** Yeah can I get one just to be safe? You all [are] questioning me to death. You all don't believe how bad–

**Sgt Richards:** You gave us some information today. You know, I mean–

**Petitioner:** It just happened to dawn on me, man.

**Sgt Richards:** Well that's good information; there ain't no doubt about it.

**Tpr Milam:** If you decide to answer questions now without a lawyer present you will have–you will still have the right to stop

4

answering questions at any time. You also have the right to stop answering at anytime until you've talked to a lawyer; do you understand that?

**Petitioner:** Yeah.

**Tpr Milam:** Alright. Initial if you understand. This here is the waiver of your rights. I'm going to read it to you. If you agree with this statement and you understand this statement I'm going to ask that you sign below; okay?

**Petitioner:** Okay.

**Tpr Milam:** I've had this statement of my rights read to me and I understand them. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me in connection with this interview. I agree to be interviewed, answer questions, and make a statement; do you understand?

**Petitioner:** Yeah.

**Tpr Milam:** Do you agree with this statement?

**Petitioner:** Yeah. Where do you want me to sign at?

**Tpr Milam:** I ask that you sign here.

The petitioner signed the waiver and the officers began taking his third statement.


For several minutes during this interview, the petitioner once again denied any knowledge of, or involvement in, his wife's disappearance. However, after the troopers pointed to inconsistencies in his story, the petitioner admitted that he killed his wife and had "meant to" do it. In a detailed confession, he revealed how he intentionally shot his wife and buried her body at the farm. He also told the officers where to find his shotgun and digging tools, and he repeatedly offered to take the troopers to the location where the body was buried. The petitioner indicated that he killed Mrs. Farley because of her relationship with another man. After the confession, the officers again confirmed that the petitioner

5

understood his *Miranda* rights; the petitioner explained he was confessing in order to relieve his conscience:

> **Sgt Richards:** We appreciate what you're willing to do for us and it won't go unnoticed. But your Miranda Rights were read to you.
> **Petitioner:** Oh. I know that.
> **Sgt Richards:** Right? Correct?
> **Petitioner:** Correct.
> **Sgt Richards:** You understand, you didn't have to tell us anything, right?
> **Petitioner:** I understand. I needed to get it off my conscience.
> **Sgt Richards:** Right. And you understand your rights. You didn't want a lawyer at this time, and you're still willing to cooperate with us and, and show us where the body of Lynnette Farley is–
> **Petitioner:** Yeah.

The petitioner indicated that a four-wheel drive vehicle would be necessary to travel to the location where the body was buried. At 1:09 p.m. the interview was halted while a four-wheel drive police vehicle was obtained, search warrants were secured for the petitioner's farm and residence, and the petitioner was given a meal. Sergeant Richards and another trooper then took the petitioner to the farm to locate the body. The audio recording of the petitioner's interview was resumed at 2:01 p.m. from inside the police vehicle during the drive to the farm.

On the way to the crime scene, Sergeant Richards once again reminded the petitioner that he had waived his *Miranda* rights. The petitioner concurred, stating "I knew I was going to have to [confess] sooner or later. . . . You all done figured it out." During the

6

drive, the petitioner admitted he had thought about "doing her in" for a while. Upon arriving

at the farm, the petitioner executed a written consent to search his properties. He then

showed the officers where he shot Mrs. Farley and where he buried her body. After

confirming that there was a grave, the troopers placed the petitioner under arrest.

On February 15, 2015, the Mercer County Grand Jury indicted the petitioner

for first degree murder.[2] Prior to his trial, the petitioner filed several motions *in limine*,

including a motion to suppress his October 3, 2014, confession and all evidence that law

enforcement obtained as a result of the confession. He argued that the October 3rd interview

occurred in a custodial environment and he expressly asked for a court-appointed lawyer,[3]

but the troopers ignored his request and proceeded to question him in violation of his

*Miranda* rights. He also asserted that the troopers should have given the formal *Miranda*

warnings a second time before the drive to the farm. The circuit court held a suppression

hearing, heard testimony from several state troopers, and reviewed both the transcript and the

audio recording of the October 3rd interview. After considering the evidence, the court found

that the petitioner was not in custody and therefore had no right to appointed counsel when

---

[2]W.Va. Code § 61-2-1 (2014).

[3]The petitioner points to the portion of his statement where Trooper Milam advised that if he was placed under arrest and could not afford a lawyer, the court would appoint a lawyer for him. As set forth in section I of this opinion, the petitioner responded, "[y]eah can I get one just to be safe? You all [are] questioning me to death. You all don't believe how bad–[.]"

he gave his statement on October 3rd. The court also ruled that the petitioner never made an unequivocal request for counsel.[4] After finding that the confession was voluntarily given, the circuit court denied the motion to suppress.

During the trial that took place on August 25 and 26, 2015, the jury heard testimony about the police investigation and listened to the audio recording of the petitioner's October 3rd confession. The medical examiner who performed an autopsy on Mrs. Farley testified she died from a gunshot wound to her chest. In addition, the State presented evidence of threatening words and behavior the petitioner had directed toward his wife in the months preceding the homicide. Mrs. Farley was employed at a Go-Mart convenience store. The store manager, Brenda Jeffrey, explained how the petitioner would sit at the store continuously for an entire eight-hour shift, watching his wife, text messaging her when she was only a few feet away, and always trying to be around her. One day the petitioner took Ms. Jeffrey aside to ask whether his wife was seeing another man. Ms. Jeffrey testified:

> I told him, I said, "You know, I don't know. She's my employee. That's none of my concern." He told me that if he ever caught her with another man up there, he would shoot me, him, her, whoever got in his way, that she was not going to be talking to somebody else while they were together.

---

[4]The State argued that the petitioner was chuckling and only joking when he purported to ask for a lawyer. After listening to the audio recording, the court determined that the atmosphere was "relaxed and nearly jocular" and the petitioner did laugh when saying he was being questioned "to death." The petitioner, however, denies that his request was a joke. He contends it is impossible to ascertain from the audio recording which man was laughing.

Ms. Jeffrey also told the jury how one weekend the petitioner used his truck to ram his wife's car in the store parking lot. The petitioner's actions caused Ms. Jeffrey to ban him from the Go-Mart store.

The petitioner, during his recorded statement on September 30th, told the troopers about ramming his truck into his wife's car. The petitioner also admitted that the previous June, he had slashed the tires on his wife's car to keep her from leaving. Finally, when called by the defense to testify, the victim's alleged paramour, Alexander Penn, reported that the petitioner once telephoned and threatened to kill Mr. Penn, Mrs. Farley, and then himself. Mr. Penn said that when Mrs. Farley was at his house, the petitioner would constantly drive by the residence.

The petitioner chose not to testify at trial but, through counsel, he focused his arguments on obtaining a recommendation of mercy. Counsel pointed to the petitioner's eventual cooperation with police on October 3rd, and he presented testimony from family members regarding the petitioner's character and relationship with Mrs. Farley. Counsel argued that Mrs. Farley and Mr. Penn had cruelly flaunted their extramarital relationship in front of the petitioner, "pushing his buttons" until he "lost it." Although the petitioner did not assert a defense based upon mental infirmity, his lawyer presented testimony from a treating psychiatrist that the petitioner had twice received in-patient care for anxiety and

9

depression related to family problems, his wife's infidelity, and the financial strain caused by his wife's spending habits.

At the conclusion of the trial, the jury found the petitioner guilty of first degree murder and did not recommend mercy. Thereafter, the petitioner filed a motion for a new trial reasserting several of the issues the circuit court had addressed *in limine*. After holding a hearing and considering the issues, the circuit court denied the motion for a new trial by order entered on October 13, 2015. By order entered on October 14, 2015, the circuit court sentenced the petitioner to life in prison without the possibility of parole. This appeal followed.

## II. Standard of Review

We apply the following standard when reviewing a circuit court's decision to deny a motion for a new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

10

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). Where a more particularized standard of review applies to a specific assignment of error, it is set forth below. With this in mind, we consider whether the petitioner is entitled to a new trial.

### III. Discussion

### A. Motion to Suppress Confession

The petitioner contends that the circuit court committed reversible error by denying his motion *in limine* to suppress his October 3rd confession. When considering a circuit court's ruling on a motion to suppress, we utilize the following standard of review: "On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference." Syl. Pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994). Further elaborating on our review of a circuit court's factual findings, this Court explained that

> [w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt. 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

11

The petitioner argues that a reasonable person in his situation would have believed himself to be in custody on October 3rd, thus his Fifth Amendment right to counsel had attached. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The petitioner contends that he asked for appointed counsel and did not initiate any further communication with the troopers, yet they ignored his request and continued with the interrogation. *See e.g.,* Syl. Pt. 2, *State v. Bowyer*, 181 W.Va. 26, 380 S.E.2d 193 (1989) ("Once an accused asks for counsel during custodial interrogation, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."). The State responds that the petitioner was not in custody or a custodial environment and therefore had no right to appointed counsel during the October 3rd interview.

It is well-settled that a person's *Miranda* right to counsel attaches only when the person is subject to custodial interrogation: "Two elements must be present before *Miranda* warnings are required: first, the person must be in custody, and, second, he or she must be interrogated." *State v. Honaker*, 193 W.Va. 51, 60, 454 S.E.2d 96, 105 (1994) (citing *Miranda*, 384 U.S. at 444). In *Miranda*, the United States Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Further elaborating on the concept of custody, the Supreme Court

12

explained that "[a]s used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion" and where a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012) (citations omitted).

In accordance with federal precedent, this Court has emphasized that "the *Miranda* right to counsel has no applicability outside the context of custodial interrogation. Therefore, until the defendant [is] taken into custody, any effort on his part to invoke his Miranda rights [is], legally speaking, an empty gesture." *State v. Bradshaw*, 193 W.Va. 519, 530, 457 S.E.2d 456, 467 (1995) (footnote omitted). "The 'inherent compulsion' that is brought about by the *combination* of custody and interrogation is crucial for the attachment of *Miranda* rights." *Id.* "The special safeguards outlined in *Miranda* are . . . only [required] where a suspect in custody is subjected to interrogation." Syl. Pt. 8, in part, *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999). "A suspect who is not in custody does not have *Miranda* rights." *State v. McKenzie*, 197 W.Va. 429, 438, 475 S.E.2d 521, 530 (1996).[5]

---

[5]*E.g., State v. Marcum*, 234 W.Va. 415, 419-20, 765 S.E.2d 304, 308-09 (2014) (recognizing that because defendant was not in custody, the "safeguards outlined in *Miranda* . . . were not required"); *State v. Williams*, 226 W.Va. 626, 629, 704 S.E.2d 418, 421 (2010) ("The Fifth Amendment right to counsel is triggered when a defendant is taken into custody by law enforcement officials who desire to interrogate him.") (internal quotation marks and citation omitted); *State v. Potter*, 197 W.Va. 734, 744, 478 S.E.2d 742, 752 (1996) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam), to conclude that "*Miranda* rights must be given and honored 'only where there has been such a restriction on a person's freedom as to render him "in custody."'").

Any precedent suggesting that a person can invoke his or her *Miranda* rights outside of the context of custodial interrogation has been expressly disavowed: "To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." *Bradshaw*, 193 W.Va. at 523, 457 S.E.2d at 460, syl. pt. 3. "[T]he 'window of opportunity' for the assertion of *Miranda* rights comes into existence only when that right is available." *Id.* at 530, 457 S.E.2d at 467. Importantly, "[a] police officer may continue to question a suspect in a noncustodial setting, even though the suspect has made a request for counsel during the interrogation, so long as the officer's continued questioning does not render statements made by the suspect involuntary." Syl. Pt. 3, *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006), *overruled on other grounds by State v. Eilola*, 226 W.Va. 698, 704 S.E.2d 698 (2010). As the Supreme Court of Illinois succinctly stated on this issue, "[o]ne cannot invoke a right that does not yet exist." *People v. Villalobos*, 737 N.E.2d 639, 645 (Ill. 2000).

Accordingly, even assuming, *arguendo,* that the petitioner made an unequivocal request for a lawyer at the beginning of the October 3rd interview, that request would be effective only if he was subject to custodial interrogation. The parties do not dispute that the troopers interrogated the petitioner during the October 3rd interview. Thus, the focus of our analysis is directed at whether that interrogation was custodial.

The "determination of whether a custodial interrogation environment exists for purposes of giving *Miranda* warnings to a suspect is based upon whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest." *Middleton*, 220 W.Va. at 93, 640 S.E.2d at 156, syl. pt. 1, in part. It is an objective analysis that "does not depend on the subjective view of either the person interrogated or the officers who conduct the interrogation." *Honaker*, 193 W.Va. at 60-61, 454 S.E.2d at 105-06, *relying upon Stansbury v. California*, 511 U.S. 318 (1994) (per curiam) (applying objective circumstances test to determine if person is in custody for *Miranda*); *accord Howes*, 565 U.S. at 509 (reaffirming objective test).

We have listed factors to be considered when making the crucial custody determination:

> The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of time between the questioning and formal arrest.

*Middleton*, 220 W.Va. at 89, 640 S.E.2d at 156, syl. pt. 2. Other relevant factors may "include the nature of the interrogator, the nature of the questioning–accusatory or investigatory, [and] the focus of the investigation at the time of question[ing.]" *Damron v. Haines*, 223 W.Va. 135, 141, 672 S.E.2d 271, 277 (2008) (citation and internal quotation

marks omitted).  Our case law in this regard comports with the more recent Supreme Court opinion in *Howes:*

> [I]n order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury*, *supra*, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, . . . its duration, . . . statements made during the interview, . . . the presence or absence of physical restraints during the questioning, . . . and the release of the interviewee at the end of the questioning[.]

*Howes*, 565 U.S. at 509 (internal citations omitted).

After considering these factors and the evidence set forth in the record, we are convinced that the objective circumstances surrounding the petitioner's October 3rd statement at the police station prove he was not in custody or in a custodial environment when he confessed to murdering his wife.  The focus of the investigation was on finding Mrs. Farley.  The petitioner filed the missing person report, and all of the evidence indicates that he consented to another interview for the purpose of the police investigation concerning that report.  He willingly accompanied the troopers to the police station, was not handcuffed, was told he was not under arrest, and was advised of his freedom to leave at any time.[6]  The interview on October 3rd was cordial and no force or restraint was used.  When he eventually confessed, the petitioner acknowledged that he did so in order to ease his conscience; it was

---

[6]The petitioner had been permitted to leave after the two prior interviews at the police station.

not in response to pressure from the police.[7]  Moreover, the portion of the October 3rd interview that took place at the police station, and which included both the written *Miranda* waiver and the detailed confession, lasted only seventy-five minutes.

At the beginning of the October 3rd interview, Trooper Milam made clear that the petitioner would only be entitled to appointed counsel *if* he was placed under arrest.[8]  The petitioner initialed the portion of the *Miranda* form indicating he was not under arrest, and he signed the form acknowledging he had been advised of these rights.  With this knowledge in mind, he proceeded to confess.  He was reminded of his *Miranda* rights two more times during the course of the October 3rd interview:  after the confession and, in a more generalized way, during the drive to the farm.

As support for his contention that he was in custody, the petitioner asserts that a reasonable person would be "anxious and suspicious if asked to come to the police station to give a recorded statement about the whereabouts of their [sic] spouse."  We are not persuaded by this argument given that the police were following-up on a missing person

[7]In his brief to this Court, the petitioner admits that he has never challenged the voluntariness of his statements.  Rather, he challenges the State's failure to provide him an appointed lawyer during the statement where he confessed.

[8]As set forth in section I of this opinion, Trooper Milam advised, "If you are–if you are under arrest and cannot afford a lawyer the court will appoint one for you before questioning at your request; do you understand that?"

17

report the petitioner had filed. Moreover, *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Orgeon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

The petitioner also claims that the presence of two officers in the interview room, with another officer occasionally entering the room, would make an ordinary person feel like he was under arrest. This contention is specious given that multiple officers were present during the petitioner's first two recorded statements, and the petitioner does not claim to have been in custody during those interviews. While the petitioner points to the fact that the troopers drove him to the detachment on October 3rd, there is no evidence to contradict the troopers' testimony that the petitioner willingly accepted their offer of a ride.

After carefully considering the entire record, we agree with the circuit court's conclusion that the petitioner was not subject to custodial interrogation when he provided the inculpatory information in the detachment interview room on October 3rd. As such, his *Miranda* rights had not attached and the troopers were not required to halt the interview when he obliquely referenced his need for a lawyer.[9] An officer "may continue to question

---

[9]Because the petitioner was not in custody, we need not address the circuit court's alternate grounds for denying the motion to suppress (i.e., the court's finding that the petitioner was only joking and never made an unequivocal request for counsel).

18

a suspect in a noncustodial setting, even though the suspect has made a request for counsel during the interrogation[.]" *Middleton*, 220 W.Va. at 93, 640 S.E.2d at 156, syl. pt. 3, in part.

Next, the petitioner contends that a "fourth statement" was begun when the troopers drove him to his farm. He argues that having already confessed to murder, a reasonable person in his position during the "fourth statement" would have considered his freedom of action curtailed to a degree associated with formal arrest. *See Middleton*, 220 W.Va. at 93, 640 S.E.2d at 156, syl. pt. 1. As such, the petitioner argues the police were required to re-administer his *Miranda* rights before the drive to the farm: "Where police have given *Miranda* warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins. Absent an effective waiver of these rights, interrogation must cease." *Bradshaw*, 193 W.Va. at 523, 457 S.E.2d at 460, syl. pt. 4.

The State responds that there was no "fourth statement," rather, the drive to the farm was merely a continuation of the "third statement" that began in the detachment interview room. During the interview at the detachment, the petitioner told the troopers where the body was buried and offered to take them to the exact location. As the State notes, the interview was halted for only fifty-two minutes for the purpose of obtaining a four-wheel drive vehicle, requesting search warrants, and providing the petitioner with a meal.

For multiple reasons, we find no reversible error in the circuit court's refusal to suppress the petitioner's statements made during the drive to, and while at, the farm. First, we agree with the State's characterization of the trip to the farm as being a mere continuation of the statement that commenced in the interview room at the police station. At the station, the petitioner offered three times to take the troopers to the body, and he further indicated the need for a four-wheel drive vehicle. The troopers halted the interview for a only short period of time while they made the necessary arrangements to travel to the site.

Second, although the petitioner relies upon syllabus point four of *Bradshaw*, a review of the audio recordings reflects that the petitioner was reminded of his *Miranda* rights an additional two times after he signed the written waiver: after he confessed but before they departed the police station, and once again at the start of the drive to the farm. Not only were his rights made clear, but he affirmatively acknowledged his understanding and his willingness to continue speaking. He made an effective waiver in satisfaction of *Bradshaw*. *See* 193 W.Va. at 523, 457 S.E.2d at 460, syl. pt. 4.

Finally, even assuming, *arguendo*, that the petitioner's statements during the drive to the farm and at the farm were viewed as the product of an un-*Mirandized* custodial interrogation, the admission of this evidence, and of the physical evidence recovered from the farm, would be harmless error beyond a reasonable doubt. *See* Syl. Pt. 5, *State v. Blair*,

158 W.Va. 647, 214 S.E.2d 330 (1975) ("Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."). Everything the petitioner said during the drive had already been revealed, in detail, during the confession he gave at the police station–including when, how, and why he killed his wife; that he had "meant to" kill her; that he buried her body on his farm; and that he brought the shotgun and digging tools with him when he drove his wife to the farm.

Furthermore, the victim's body would have been recovered even if the petitioner had not personally traveled to the farm with the officers. "Under the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule if it is shown that the evidence would have been discovered pursuant to a properly executed search warrant." Syl. Pt. 3, *State v. Flippo*, 212 W.Va. 560, 575 S.E.2d 170 (2002). To prevail under the inevitable discovery exception to the exclusionary rule, the State must prove by a preponderance

> (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct.

*Id.* at 563-64, 575 S.E.2d at 173-74, syl. pt. 4, in part.

21

The recovery of the victim's body was inevitable. During the interview at the police station, the petitioner told the officers he had killed his wife and buried her body on his farm in Mercer County. This was admissible evidence that the troopers would have pursued even without the petitioner's assistance in locating the body at the farm. Corporal P.H. Shrewsbury, the team leader for the State Police Crime Scene Recovery Unit that processed this crime scene, gave un-refuted testimony that if the petitioner had not taken the troopers to the shallow grave, they would have used a cadaver dog or blood hound to seek out the victim's decomposing body. Thus, while the petitioner's assistance at the farm allowed the troopers to more quickly recover the body, this recovery was inevitable. Accordingly, for all of the reasons set forth above, we affirm the circuit court's denial of the motion to suppress the petitioner's October 3rd statement.

## B.  Samples Collected by Medical Examiner

Although he combined them into one assignment of error, the petitioner raises two separate issues from the circuit court's denial of his motions *in limine* concerning forensic samples collected by the West Virginia Office of the Chief Medical Examiner (hereinafter "Medical Examiner's Office"). First, the petitioner alleges the trial court erred by refusing his written motion to dismiss the indictment or, in the alternative, issue an instruction to the jury regarding the State's loss of fingernail scrapings from the victim's

22

right hand.[10]  Second, he argues the circuit court erred by denying his oral motion to continue the trial to allow him to arrange for testing of the remaining forensic samples in the State's possession.  We will address these contentions separately.

### 1. Motion to Dismiss or, in the alternative, Motion for Jury Instruction

The record indicates that as part of the routine procedures performed before every autopsy, employees of the Medical Examiner's Office collected samples from the victim's body including blood, pulled head and pubic hair, and fingernail and toenail scrapings.  A gunshot residue kit and sexual assault kit were also administered.  The troopers did not request the collection of these samples, and the samples were not tested.  After the autopsy was completed, these materials were sent to the investigating troopers for storage.  In a report accompanying the materials, the Medical Examiner's Office advised that it was sending eleven items including a container with nail scrapings from the victim's right hand.  However, during a hearing, the trooper responsible for receiving the evidence testified he only received ten containers, none of which were labeled as holding the right hand nail scrapings.  The trooper did receive separate containers labeled as the nail scrapings from the victim's left hand, left foot, and right foot, as well as the other collected materials.[11]

_____

[10]Although the petitioner's brief refers to these as nail "clippings," we will use the term nail "scrapings" as reflected in the documentation from the Medical Examiner's Office contained in the appendix record.

[11]It is unknown whether the right fingernail scrapings were lost or merely comingled with other nail scrapings.  If they were lost, it is unclear whether the loss occurred when the

In his motion to dismiss, the petitioner argued the right hand nail scrapings could contain DNA that, if tested, would exonerate him. Essentially, he suggested there might be DNA from a different killer under the victim's fingernails. If the court refused his motion to dismiss, the petitioner asked the court to instruct the jury that it could infer the missing evidence would have been adverse to the State's case.

The circuit court held a pre-trial evidentiary hearing in accordance with *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995). In *Osakalumi*, this Court explained what a trial court must consider when determining what consequences should flow from the State's loss of evidence:

> When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

---

items where in the custody of the Medical Examiner's Office or the State Police.

*Id.* at 759, 461 S.E.2d at 505, syl. pt. 2. After hearing the evidence and argument, the circuit court concluded the State had a duty to preserve the right fingernail scrapings, and that these scrapings would have been subject to disclosure upon the petitioner's request. Nonetheless, the court determined that no consequences should flow from the State's handling of these samples because they were completely irrelevant to the case. There was no evidence presented or proffered that the victim was involved in a physical altercation with the petitioner or anyone else, and the petitioner had already confessed to shooting her. After characterizing the petitioner's *Osakalumi* argument as speculative and a "red herring," the court denied the motion.

We quickly dispose of the petitioner's assertion that this ruling constitutes reversible error. It is abundantly clear that even if the State had a duty to preserve these nail scrapings, and even if that duty was breached, the State's conduct had absolutely no impact on the trial's outcome. *Osakalumi* requires an evaluation of "the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available" as well as "the sufficiency of the other evidence produced at the trial to sustain the conviction." *Id.* These nail scrapings were collected as part of the Medical Examiner Office's routine procedures for every case, and there is no reason to suppose the scrapings would have any evidentiary value or would lead to any exculpatory evidence. The petitioner suggests that another person might have killed Mrs. Farley and this other person's DNA might have been under Mrs. Farley's fingernails, but this claim is directly contradicted

25

by the overwhelming evidence of the petitioner's guilt. He confessed to killing his wife; he led police to the victim's body; the body was buried on remote property he owned; he visited that property on the day his wife disappeared; he committed threatening acts against his wife in the months leading up to the murder; he told police where to find the murder weapon; and his wife's infidelity provided his motive. There is also no evidence to suggest that Mrs. Farley was involved in a physical altercation with the petitioner or anyone else. Finally, if the petitioner truly wished to explore whether these samples contained exculpatory evidence, he could have timely sought testing of the victim's left hand nail scrapings.

Not only did the circuit court correctly deny the motion to dismiss the indictment, the court also properly concluded there were no grounds to instruct the jury regarding the missing evidence. "'Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given.' Syl. pt. 4, *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971)." Syl. Pt. 14, *State v. Davis*, 232 W.Va. 398, 752 S.E.2d 429 (2013). There is simply no evidence to support the negative inference jury instruction sought by the petitioner.

### 2. Motion to Continue Trial

During the August 11, 2015, pretrial hearing, the petitioner's counsel orally moved for a continuance of the trial scheduled for August 25, 2015, so that he could have forensic testing performed on the remaining samples collected by the Medical Examiner's

26

Office. Recalling its earlier findings about the purely speculative nature of the petitioner's DNA arguments, and because the petitioner knew about the other samples for three months but did not timely request testing, the circuit court denied the motion to continue the trial. The petitioner challenges this ruling on appeal.

"A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion." Syl. Pt. 2, *State v. Bush*, 163 W.Va. 168, 255 S.E.2d 539 (1979). "Whether there has been an abuse of discretion in denying a continuance must be decided on a case-by-case basis in light of the factual circumstances presented, particularly the reasons for the continuance that were presented to the trial court at the time the request was denied." *Id.* at 169, 255 S.E.2d at 540, syl. pt. 3. To conclude that a trial court abused its discretion, this Court must find that the denial of a continuance caused prejudice to the moving party:

> "The granting of a continuance is a matter within the sound discretion of the trial court, though subject to review, and the refusal thereof is not ground[s] for reversal unless it is made to appear that the court abused its discretion, and that its refusal has worked injury and prejudice to the rights of the party in whose behalf the motion was made." Syllabus point 1, *State v. Jones*, 84 W.Va. 85, 99 S.E. 271 (1919).

Syl. Pt. 1, *State v. Dunn*, 237 W.Va. 155, 786 S.E.2d 174 (2016).

27

After reviewing the record and considering the parties' arguments on this issue, we agree with both of the circuit court's reasons for denying this motion. The petitioner was not prejudiced by the denial of his requested continuance because there is absolutely no indication that forensic testing on the remaining samples would have provided any useful information. As the circuit court found, the petitioner's DNA argument is simply a "red herring." Moreover, if he desired this testing, he should have made a timely request. To obviate the delay, the petitioner's counsel asserts it would have been "inconceivable" to ask for the testing prior to a ruling on the *Miranda* motion *in limine*. We disagree. If the petitioner truly believed testing would be of some benefit, there was no reason to wait for the ruling on the unrelated suppression issue. Accordingly, we find no abuse of discretion in the circuit court's denial of the motion to continue the trial.

## C. Rule 404(b) Motion

Before trial, the State filed a notice of intent to introduce evidence pursuant to Rule 404(b) of the West Virginia Rules of Evidence[12] or, in the alternative, as evidence

---

[12]West Virginia Rule of Evidence 404(b) (2017) provides:

> *(b) Crimes, wrongs, or other acts.*
> (1) *Prohibited uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) *Permitted uses; notice required.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Any party seeking the

intrinsic to this crime. This evidence included the petitioner's conduct at Go-Mart, his threat to kill his wife because of her extramarital affair, and the two incidents where he purposely damaged her vehicle. The notice also addressed the petitioner's admission to police that he had been thinking about killing his wife for some time. The petitioner responded that this was prior bad acts evidence offered to show he acted in conformity therewith; thus it should be excluded pursuant to Rule 404(b)(1). In addition, he asserted that the evidence should be excluded pursuant to West Virginia Rule of Evidence 403 because its introduction would be substantially more prejudicial than probative.[13]

After considering the parties' briefs and holding a pretrial hearing, the circuit court concluded that the evidence was intrinsic evidence, part of the *res gestae* of the crime. Our cases have "consistently held that evidence which is 'intrinsic' to the indicted charge is not governed by Rule 404(b)." *State v. Harris*, 230 W.Va. 717, 722, 742 S.E.2d 133, 138 (2013). The circuit court also determined the evidence was more probative than prejudicial in satisfaction of the balancing test of Rule 403.

admission of evidence pursuant to this subsection must:
(A) provide reasonable notice of the general nature and the specific and precise purpose for which the evidence is being offered by the party at trial; and
(B) do so before trial–or during trial if the court, for good cause, excuses lack of pretrial notice.

[13]West Virginia Rule of Evidence 403 (2017) provides, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Before this Court, the petitioner reasserts the arguments he made below. The State responds in support of the circuit court's decision to admit the evidence. On appeal, "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). After carefully reviewing both the record and the parties' arguments, we find no abuse of discretion in the circuit court's ruling. The petitioner's admission that he had been thinking about killing his wife, and his threats to do so, evidence both premeditation and deliberation. Thus, this was direct evidence offered to prove elements of the offense of first degree murder.

Furthermore, the petitioner's recent threatening behavior directed at his wife fits squarely within the concept of *res gestae* evidence intrinsic to the crime. "'Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial.' Syllabus point 3, *State v. Ferguson*, 165 W.Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds by State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)." Syl. Pt. 7, *State v. McKinley*, 234 W.Va. 143, 764 S.E.2d 303 (2014). Hearing about the incidents at Mrs. Farley's workplace and the damage to her vehicle gave the jury necessary information about the petitioner's motivation to commit murder. *See State v. LaRock*, 196 W.Va. 294, 313, 470 S.E.2d 613, 632 (1996) (evidence of defendant's prior attacks on child "not only demonstrated the motive and setup of the crime [of later murdering the child] but

30

also was necessary to place the child's death in context and to complete the story of the charged crime. We hold that historical evidence of uncharged prior acts which is inextricably intertwined with the charged crime is admissible over a Rule 403 objection."); *State v. Hutchinson*, 215 W.Va. 313, 321, 599 S.E.2d 736, 744 (2004) ("We find that the evidence which the appellant challenges on this appeal was merely presented as context evidence illustrating why the appellant committed this murder. It portrayed to the jurors the complete story of the inextricably linked events of the day and amounted to intrinsic evidence."); *McKinley*, 234 W.Va. at 156, 764 S.E.2d at 316 (although two prior "domestic violence incidents . . . were not a 'single criminal episode,' we believe this evidence was necessary to place Ms. Patton's death in context with her relationship with Mr. McKinley, and to complete the story of the violence Mr. McKinley inflicted on her."). Accordingly, we find no error in the admission of this evidence.

### D.  Motion to Bifurcate Trial

The petitioner contends the circuit court committed reversible error by denying his oral and written motions to bifurcate the trial into separate guilt and mercy phases.[14] Despite prompting from the trial court, the petitioner's counsel was unable to identify any evidence he intended to offer during a mercy phase that would not also be offered in a guilt

---

[14]When a trial is bifurcated, the issue in the mercy phase "is whether or not the defendant, who already has been found guilty of murder in the first degree, should be afforded mercy, *i.e.*, afforded the opportunity to be considered for parole after serving no less than fifteen years of his or her life sentence." *State v. Trail*, 236 W.Va. 167, 181, 778 S.E.2d 616, 630 (2015) (footnote omitted).

phase in an effort to reduce the degree of criminal culpability.[15]  Accordingly, the circuit

court denied the motions to bifurcate the trial.

We review this ruling for an abuse of discretion.  "A trial court has

discretionary authority to bifurcate a trial and sentencing in any case where a jury is required

to make a finding as to mercy." *LaRock*, 196 W.Va. at 299, 470 S.E.2d at 618, syl. pt. 4.

The *LaRock* Court outlined factors for a trial court to consider when ruling on a motion to

bifurcate:

> Although it virtually is impossible to outline all factors
> that should be considered by the trial court, the court should
> consider when a motion for bifurcation is made: (a) whether
> limiting instructions to the jury would be effective; (b) whether
> a party desires to introduce evidence solely for sentencing
> purposes but not on the merits; (c) whether evidence would be
> admissible on sentencing but would not be admissible on the
> merits or vice versa; (d) whether either party can demonstrate
> unfair prejudice or disadvantage by bifurcation; (e) whether a
> unitary trial would cause the parties to forego introducing
> relevant evidence for sentencing purposes; and (f) whether
> bifurcation unreasonably would lengthen the trial.

*Id.,* syl. pt. 6.  The burden of convincing the circuit court to bifurcate the trial rested with the

petitioner:  "The burden of persuasion is placed upon the shoulders of the party moving for

bifurcation.  A trial judge may insist on an explanation from the moving party as to why

bifurcation is needed." *Id.,* syl. pt. 5, in part.

---

[15]In addition to first degree murder without mercy, the jury was instructed on first
degree murder with mercy, second degree murder, and voluntary manslaughter.

On appeal, the petitioner asserts he *"would have liked* to argue culpability without having to discuss the leniency of the sentencing issue together." (emphasis added). Although he may have preferred bifurcation, he does not sufficiently explain how bifurcation would have benefitted him or why the unitary trial was unfairly prejudicial or disadvantageous to him. For example, he does not allude to any evidence that would have been admissible only during a mercy phase, or to any evidence he was required to forego because of the unitary nature of the trial. He also does not point to any evidence that required a limiting instruction because of the unitary trial. The petitioner argues he "was convicted on his confession . . . and you don't stand up at trial and tell a jury that your client would not have confessed or disclosed the body because he didn't get a lawyer." We fail to see how this argument supports bifurcation. After carefully reviewing the record, we find no abuse of discretion in the circuit court's denial of the motions to bifurcate.

## IV. Conclusion

For the foregoing reasons, we find no error in the circuit court's denial of the petitioner's motion for a new trial. The petitioner's conviction for first degree murder without a recommendation of mercy is affirmed.

Affirmed.